## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 19-22604-MARTINEZ/AOR

NOEMI VALENZUELA,

      Plaintiff,

v.

ANDREW SAUL,
Commissioner for,
Social Security Administration,

      Defendant.

_____ /

### REPORT AND RECOMMENDATION

THIS CAUSE came before the Court upon Plaintiff Noemi Valenzuela's ("Claimant") Motion for Summary Judgment (hereafter, "Claimant's Motion for Summary Judgment") [D.E. 21] and Defendant Andrew Saul, Commissioner for the Social Security Administration's ("Commissioner") Motion for Summary Judgment (hereafter, "Commissioner's Motion for Summary Judgment") [D.E. 22]. The administrative transcript (hereafter, "TR.") has been filed [D.E. 13].[1] For the reasons stated below, the undersigned respectfully recommends that Claimant's Motion for Summary Judgment be DENIED, the Commissioner's Motion for Summary Judgment be GRANTED, and the Commissioner's decision be AFFIRMED.

### PROCEDURAL HISTORY

In December 2015, Claimant filed applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI"), alleging a disability onset date of January 1, 2009, which was later amended to June 30, 2015. TR. 310-20, 336. The applications were denied initially and upon reconsideration. Id. at 98-157. Pursuant to a written

---

[1] The references hereafter (TR. __) are to the transcript pages rather than the court record pages.

request, a hearing was held on March 21, 2018 before Administrative Law Judge Tracey B. Leibowitz ("ALJ Leibowitz"), which was adjourned to July 17, 2018 so that Claimant could secure legal representation.  Id. at 90-97.  At the continued hearing held on July 17, 2018, Claimant and Vocational Expert Joey Kilpatrick ("VE Kilpatrick") testified.  Id. at 65-89.  On August 17, 2018, ALJ Leibowitz issued an Unfavorable Decision, finding that:

(1) Claimant met the insured status requirements of the Social Security Act through June 30, 2015.  Id. at 17.

(2) Claimant had not engaged in substantial gainful activity since June 30, 2015, the amended alleged onset date (20 C.F.R. §§ 404.1571 et seq. and 416.971 et seq.).  Id.

(3) Claimant had the following severe impairments: dysphagia, recurrent arrhythmias, degenerative disc disease, anxiety disorders, affective disorders, postural orthostatic tachycardia syndrome ("POTS"), and coronary artery disease (20 C.F.R. §§ 404.1520(c) and 416.920(c)).  Id. at 18.

(4) Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  Id.[2]

(5) Claimant had the residual functional capacity ("RFC") to perform sedentary work subject to additional limitations.  Id. at 20-21.[3]

(6) Claimant was unable to perform any past relevant work (20 C.F.R. §§ 404.1565

---

[2] The Social Security Administration's ("SSA") Listing of Impairments "describes for each of the major body systems impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. §§ 404.1525(a) and 416.925(a).

[3] The RFC is the ability of a claimant to do physical and mental work activities on a sustained basis, despite the claimant's limitations or impairments.  20 C.F.R. §§ 404.1545(a)(1) and 416.945(a)(1).  The RFC must be determined based on all of the claimant's impairments, even those that are not considered "severe."  See 20 C.F.R. §§ 404.1520, 404.1545, 416.920 and 416.945.

"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. §§ 404.1567(a) and 416.967(a).

and 416.965).  <u>Id.</u> at 24.[4]

(7) Claimant was born on June 5, 1975 and was 40 years old, which was defined as a younger individual, on the amended alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).  <u>Id.</u> at 25.

(8) Claimant had at least a high school education and was able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).  <u>Id.</u>

(9) Transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that Claimant was "not disabled," whether or not Claimant had transferable job skills (<u>See</u> SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).  <u>Id.</u>[5]

(10) Considering Claimant's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Claimant could perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)). <u>Id.</u>

(11) Claimant had not been under a disability, as defined in the Social Security Act, from June 30, 2015 through the date of the Unfavorable Decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).  <u>Id.</u> at 26.

On June 12, 2019, the Appeals Council denied a request for review of ALJ Leibowitz's Unfavorable Decision.  <u>Id.</u> at 1-8.  On June 24, 2019, pursuant to 42 U.S.C. § 405(g), Claimant filed this action seeking reversal of ALJ Leibowitz's final administrative decision [D.E. 1].

In support of her contention that ALJ Leibowitz's Unfavorable Decision should be reversed, Claimant argues that:

I.      The ALJ committed reversible error in failing to set forth the requisite good cause for according just "little" weight to the opinions of Claimant's treating psychiatrist, Dr. Oscar Canosa, and just "partial" weight to the opinions of Claimant's treating cardiologist, Dr. Litsa Lambrakos.

II.     The ALJ's RFC finding is not supported by the substantial evidence of record.

---

[4] "Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it."  20 C.F.R. §§ 404.1560(b)(1) and 416.960(b)(1).

[5] SSRs are a series of precedential decisions relating to the programs administrated by the SSA and are published under the authority of the Commissioner of Social Security.  <u>See</u> http://ssa.gov/regulations/def-ssr.htm.

III.     The ALJ failed to properly assess Claimant's alleged symptoms and limitations.

<u>See</u> Claimant's Motion for Summary Judgment [D.E. 21 at 7-19].

<u>**RELEVANT MEDICAL EVIDENCE**</u>

I.     **Treating Sources**

A.  **Healing Touch C C Inc. ("Healing Touch")**

Claimant visited Healing Touch, from December 24, 2014 to April 24, 2018, where she received diagnoses of: bipolar disorder; panic disorder; and anxiety disorder.  TR. 570-628.

On December 24, 2014, Claimant presented at Healing Touch for an initial consultation. <u>Id.</u> at 627.  Claimant complained of decreased energy, crying spells, insomnia, and irritability or angry outbursts; but she denied experiencing difficulty concentrating or thinking, hypersomnia, sadness, poor motivation, panic attacks, emotional withdrawal or isolation, anxiety, memory problems, excessive worries, and excessive fear.  <u>Id.</u> at 628.  On mental status exam, it was noted that: Claimant was cooperative and friendly with good eye contact and a calm behavior; she exhibited logical thought content and form; she was depressed and anxious; her affect was inappropriate; she was oriented in all spheres; her memory, judgment, and insight were intact; anhedonia was not present; her attention/concentration was normal; and her sleep and motivation were fair.  <u>Id.</u> Claimant was prescribed psychiatric medication.  <u>Id.</u>

On January 28, 2015, Claimant was seen by Oscar Canosa, M.D. ("Dr. Canosa"), a psychiatrist.  <u>Id.</u> at 625.  Claimant complained of decreased energy, insomnia, anxiety, panic attacks, sadness, and excessive worries; but she denied experiencing anhedonia, difficulty concentrating or thinking, irritability or angry outbursts, crying spells, hypersomnia, poor motivation, emotional withdrawal or isolation, and memory problems.  <u>Id.</u>  On mental status exam, Dr. Canosa noted that: Claimant was cooperative and friendly with good eye contact and a calm behavior; she exhibited logical thought content and form; she was depressed and anxious; her

4

affect was stable and appropriate; she was oriented in all spheres; anhedonia was not present; her attention/concentration was normal; and her motivation was fair.  Id.  Dr. Canosa noted that Claimant's condition was moderate, and that she had shown some improvement since her last visit; and he adjusted her medication regimen at the conclusion of the visit.  Id. at 625-26.

On March 23, 2015, Claimant complained of decreased energy, insomnia, anxiety, panic attacks, sadness, and excessive worries; but she denied experiencing anhedonia, difficulty concentrating or thinking, irritability or angry outbursts, crying spells, hypersomnia, poor motivation, emotional withdrawal or isolation, and memory problems. Id. at 623.  On mental status exam, it was noted that: Claimant was cooperative and friendly with good eye contact and a calm behavior; she exhibited logical thought content and form; she was depressed and anxious; her affect was stable and appropriate; she was oriented in all spheres; her memory, judgment, and insight were intact; anhedonia was not present; her attention/concentration was normal; and her sleep and motivation were fair.  Id.  It was noted that there had been no significant change in Claimant's condition since her last visit, and her medication regimen was adjusted at the conclusion of the visit.  Id. at 623-24.

On April 9, 2015, Claimant was seen by Dr. Canosa.  Id. at 621. Claimant complained of decreased energy, insomnia, and anxiety; but she denied experiencing anhedonia, difficulty concentrating or thinking, irritability or angry outbursts, crying spells, hypersomnia, sadness, poor motivation, panic attacks, emotional withdrawal or isolation, memory problems, and excessive worries.  Id.  On mental status exam, Dr. Canosa noted that: Claimant was cooperative and friendly with good eye contact and a calm behavior; she exhibited logical thought content and form; she was anxious; her affect was stable and appropriate; she was oriented in all spheres; her memory and insight were intact; her sleep was good; her attention/concentration was normal; and her motivation was fair.  Id.  Dr. Canosa noted that there was no significant change in her condition

5

since her last visit, and he adjusted her medication regimen at the conclusion of the visit.  Id. at 621-22.

On April 25, 2015, Claimant was seen by Dr. Canosa.  Id. at 619.  Claimant complained of decreased energy, anxiety, and excessive worries; but she denied experiencing anhedonia, difficulty concentrating or thinking, irritability or angry outbursts, crying spells, hypersomnia and insomnia, sadness, poor motivation, panic attacks, emotional withdrawal or isolation, and memory problems.  Id.  On mental status exam, Dr. Canosa noted that: Claimant was cooperative and friendly with good eye contact and a calm behavior; she exhibited logical thought content and form; she was anxious; her affect was stable and appropriate; she was oriented in all spheres; her memory, judgment, and insight were intact; her sleep was good; anhedonia was not present; her attention/concentration was normal; and her motivation was fair.  Id.  Dr. Canosa noted that there was no significant change in Claimant's condition since her last visit, and he adjusted her medication regimen at the conclusion of the visit.  Id. at 619-20.

On May 4, 2015, Claimant complained of poor motivation, anxiety, and excessive worries; but she denied experiencing anhedonia, difficulty concentrating or thinking, irritability or angry outbursts, crying spells, hypersomnia and insomnia, sadness, panic attacks, emotional withdrawal or isolation, and memory problems.  Id. at 617.  On mental status exam, it was noted that: Claimant was cooperative and friendly with good eye contact and a calm behavior; she exhibited logical thought content and form; she was depressed and anxious; her affect was inappropriate; she was oriented in all spheres; her memory, judgment, and insight were intact; anhedonia was not present; her attention/concentration was normal; and her sleep and motivation were poor.  Id.  It was noted that Claimant's condition was better, but still needed improvement, and her medication regimen was adjusted at the conclusion of the visit.  Id. at 617-18.

On June 2, 2015, Claimant complained of insomnia and anxiety; but she denied

experiencing anhedonia, decreased energy, difficulty concentrating or thinking, irritability or angry outbursts, crying spells, hypersomnia, sadness, poor motivation, panic attacks, emotional withdrawal or isolation, memory problems, and excessive worries.  Id. at 615.  On mental status exam, it was noted that: Claimant was cooperative and friendly with good eye contact and a calm behavior; she exhibited logical thought content and form; she was anxious; her affect was stable and appropriate; she was oriented in all spheres; her memory, judgment, and insight were intact; anhedonia was not present; her attention/concentration was normal; and her sleep and motivation were fair.  Id.  It was noted that Claimant's condition was moderate and controlled with the current medication regimen.  Id. at 615-16.

On August 8, 2015, Claimant complained of anxiety; but she denied experiencing difficulty concentrating or thinking, irritability or angry outbursts, crying spells, insomnia and hypersomnia, and emotional withdrawal or isolation.  Id. at 613.  On mental status exam, it was noted that: Claimant was cooperative with good eye contact; she exhibited logical thought content and form; she was anxious; her affect was stable and appropriate; she was oriented in all spheres; her memory, judgment, and insight were intact; her sleep was good; anhedonia was not present; her attention/concentration was normal; and her motivation was fair.  Id.  It was noted that Claimant's condition was better, but still needed improvement, and her medication regimen was adjusted at the conclusion of the visit.  Id. at 613-14.

On August 15, 2015, Claimant was seen by Dr. Canosa.  Id. at 611.  Claimant complained of anxiety; but she denied experiencing anhedonia, sadness, poor motivation, panic attacks, and emotional withdrawal or isolation.  Id.  On mental status exam, Dr. Canosa noted that: Claimant was cooperative with good eye contact; she exhibited logical thought content and form; she was anxious; her affect was stable and appropriate; she was oriented in all spheres; her memory, judgment, and insight were intact; her sleep was good; anhedonia was not present; her

attention/concentration was normal; and her motivation was fair.  Id.  Dr. Canosa noted that her condition was better, but that there was still room for improvement, and he adjusted her medication regimen at the conclusion of the visit.  Id. at 611-12

On September 5, 2015, Claimant reported that she was feeling better with the current medication regimen; but she denied experiencing anhedonia, decreased energy, difficulty concentrating or thinking, irritability or angry outbursts, crying spells, hypersomnia and insomnia, sadness, poor motivation, panic attacks, emotional withdrawal or isolation, memory problems, anxiety, and excessive worries.  Id. at 609.  On mental status exam, it was noted that: Claimant was cooperative with good eye contact; she exhibited logical thought content and form; she was euthymic; her affect was stable and appropriate; she was oriented in all spheres; her memory, judgment, and insight were intact; anhedonia was not present; her attention/concentration was normal; and her sleep and motivation were good.  Id.  It was noted that her condition was better since her last visit, but still needed improvement.  Id.

On October 21, 2015, Claimant complained of excessive worries; but she denied experiencing anhedonia, decreased energy, difficulty concentrating or thinking, irritability or angry outbursts, crying spells, hypersomnia and insomnia, sadness, poor motivation, panic attacks, emotional withdrawal or isolation, memory problems, mood shifts, and anxiety.  Id. at 607.  On mental status exam, it was noted that: Claimant was cooperative and friendly with good eye contact and a calm behavior; she exhibited logical thought content and form; her thought process was concrete; she was euthymic; her affect was stable and appropriate; she was oriented in all spheres; her memory, judgment, and insight were intact; anhedonia was not present; her attention/concentration was normal; and her sleep and motivation were good.  Id. at 607-08.  It was noted that her condition was mild and controlled with medications, and her medication regimen was again adjusted at the conclusion of the visit.  Id.

8

On November 19, 2015, Claimant complained of panic attacks and anxiety; but she denied experiencing anhedonia, decreased energy, difficulty concentrating or thinking, irritability or angry outbursts, crying spells, hypersomnia and insomnia, sadness, emotional withdrawal or isolation, mood shifts, and memory problems. Id. at 605. On mental status exam, it was noted that: Claimant was cooperative and friendly with good eye contact and a calm behavior; she exhibited logical thought content and form; her thought process was concrete; she was anxious; her affect was constricted; she was oriented in all spheres; her memory, judgment, and insight were intact; her sleep was good; anhedonia was not present; her attention/concentration was normal; and she had fair motivation. Id. at 605-06. Claimant's condition was noted to be mild and controlled by medications, although she was not taking her medication properly. Id. Claimant's medication regimen was adjusted at the conclusion of the visit. Id. at 606.

On December 5, 2015, Claimant was seen by Dr. Canosa. Id. at 603. Claimant reported that she was feeling better with the current medication regimen; but she denied experiencing anhedonia, decreased energy, difficulty concentrating or thinking, irritability or angry outbursts, crying spells, hypersomnia and insomnia, sadness, poor motivation, panic attacks, emotional withdrawal or isolation, memory problems, and excessive worries. Id. On mental status exam, Dr. Canosa noted that: Claimant was cooperative and friendly with good eye contact and a calm behavior; she exhibited logical thought content and form; her thought process was concrete; she was euthymic; her affect was stable and appropriate; she was oriented in all spheres; her memory, judgment, and insight were intact; anhedonia was not present; her attention/concentration was normal; and her sleep and motivation were good. Id. at 603-04. Dr. Canosa noted that Claimant was at baseline and that her condition was mild and controlled by her medications. Id. at 603.

On January 23, 2016, Claimant complained of sadness and anxiety; but she denied experiencing anhedonia, decreased energy, difficulty concentrating or thinking, irritability or

angry outbursts, crying spells, hypersomnia and insomnia, panic attacks, emotional withdrawal or isolation, memory problems, mood shifts, and excessive worries.  Id. at 601.  On mental status exam, it was noted that: Claimant was cooperative with good eye contact; she exhibited logical thought content and form; her thought process was concrete; she was depressed and anxious; her affect was constricted; she was oriented in all spheres; her memory, judgment, and insight were intact; her attention/concentration was normal; and her motivation was fair.  Id. at 601-02.  It was noted that Claimant's condition was mild and her medication regimen was adjusted at the conclusion of the visit.  Id.

On April 19, 2016, Claimant complained of anxiety, excessive fear, panic attacks, and difficulty concentrating or thinking; but she denied experiencing anhedonia, decreased energy, irritability or angry outbursts, crying spells, hypersomnia and insomnia, emotional withdrawal or isolation, memory problems, excessive worries, poor motivation, mood shifts, and sadness.  Id. at 599.  On mental status exam, it was noted that Claimant: was cooperative with good eye contact; she exhibited logical thought content and form; her thought process was concrete; she was depressed and anxious; her affect was expressive; she was oriented in all spheres; her memory, judgment, and insight were intact; she was distracted; and her motivation was fair.  Id. at 599-600. It was noted that Claimant's condition was moderate and her medication regimen was adjusted at the conclusion of the visit.  Id.

On May 21, 2016, Claimant reported feeling better; she complained of anxiety, almost daily panic attacks, and difficulty concentrating or thinking; but she denied experiencing anhedonia, decreased energy, irritability or angry outbursts, crying spells, insomnia and hypersomnia, emotional withdrawal or isolation, memory problems, excessive worries, poor motivation, mood shifts, and sadness.  Id. at 597.  On mental status exam, it was noted that: Claimant was cooperative with good eye contact; she exhibited logical thought content and form;

her thought process was concrete; she was anxious; her affect was expressive; she was oriented in all spheres; her memory, judgment, and insight were intact; she was distracted; and her motivation/energy was good.  Id. at 597-98.  It was noted that Claimant's condition was better, but still need improvement, and her medication regimen was adjusted at the conclusion of the visit. Id.

On July 16, 2016, Claimant complained of anxiety, panic attacks, difficulty concentrating, sadness, excessive worries, and poor motivation; but she denied experiencing anhedonia, decreased energy, irritability or angry outbursts, crying spells, insomnia and hypersomnia, emotional withdrawal or isolation, memory problems, mood shifts, and excessive fear.  Id. at 595. On mental status exam, it was noted that: Claimant was cooperative with good eye contact; she exhibited logical thought content and form; her thought process was concrete; she was anxious and depressed; her affect was expressive; she was oriented in all spheres, her memory and judgment were intact; her insight was fair; she was distracted; and her motivation/energy was poor. Id. at 595-96.  It was noted that Claimant's condition was better, but still needed improvement.  Id. at 596.

On December 20, 2016, Claimant complained of decreased energy, anxiety, excessive worries, sadness, poor motivation, mood shifts, and difficulty concentrating or thinking; but she denied experiencing anhedonia, irritability or angry outbursts, crying spells, insomnia and hypersomnia, panic attacks, emotional withdrawal or isolation, memory problems, and excessive fear.  Id. at 593.  On mental status exam, it was noted that: Claimant was cooperative with good eye contact; she exhibited logical thought content and form; her thought process was concrete; she was anxious and depressed; she was oriented in all spheres; her memory and judgment were intact; her insight was fair; she was distracted; and her motivation/energy were fair.  Id. at 593-94.  It was noted that Claimant's condition was better, but still needed improvement, and her medication

11

regimen was adjusted at the conclusion of the visit.  Id. at 594.

On January 31, 2017, Claimant complained of decreased energy, anxiety, excessive worries, and difficulty concentrating; but she denied experiencing anhedonia, irritability or angry outbursts, crying spells, insomnia and hypersomnia, panic attacks, emotional withdrawal or isolation, memory problems, excessive fear, sadness, mood shifts, and poor motivation.  Id. at 591. It was noted that: Claimant was alert and in no acute distress; she had no visual difficulties or dyspnea, her coordination and gait were normal; she was cooperative with good eye contact; she exhibited logical thought content and form; her thought process was concrete; she was anxious and distracted; her affect was labile; she was oriented in all spheres; her memory was intact; and her insight and motivation/energy were fair.  Id. at 591-92.  It was noted that Claimant's condition was better, but still needed improvement, and her medication regimen was adjusted at the conclusion of the visit.  Id. at 592.

On April 28, 2017, Claimant reported feeling well with the current medication regimen; she complained of decreased energy, anxiety, excessive worries, and difficulty concentrating or thinking; but she denied experiencing anhedonia, irritability or angry outbursts, crying spells, insomnia and hypersomnia, panic attacks, emotional withdrawal or isolation, memory problems, excessive fear, mood shifts, and poor motivation.  Id. at 589.  It was noted that: Claimant was alert and not in acute distress; she had no visual difficulties or dyspnea; her coordination and gait were normal; she was cooperative with good eye contact; she exhibited logical thought content and form; her thought process was concrete; she was distracted and mildly anxious; her affect was constricted; she was oriented in all spheres; her memory and judgment were intact; her insight and motivation/energy were fair.  Id. at 589-90.  It was noted that Claimant's condition was mild and controlled with the current medication regimen.  Id.

On May 30, 2017, Claimant complained of decreased energy, anxiety, excessive worries,

and difficulty concentrating or thinking; but she denied experiencing anhedonia, irritability or angry outbursts, crying spells, insomnia and hypersomnia, panic attacks, emotional withdrawal or isolation, memory problems, excessive fear, mood shifts, and poor motivation. Id. at 587. It was noted that: Claimant was alert and not in distress; she had no visual difficulties or dyspnea; she was cooperative with good eye contact; she exhibited logical thought content and form; her thought process was concrete; she was anxious and distracted; her affect was constricted; she was oriented in all spheres; her memory and judgment were intact; and her insight and motivation/energy were fair. Id. at 587-88. It was noted that Claimant's condition was mild and controlled with the current medication regimen, and her medication regimen was adjusted at the conclusion of the visit. Id.

On August 30, 2017, Claimant complained of decreased energy, anxiety, excessive worries, difficulty concentrating or thinking, and irritability or angry outbursts; but she denied experiencing anhedonia, crying spells, insomnia and hypersomnia, panic attacks, emotional withdrawal or isolation, memory problems, excessive fear, sadness, mood shifts, and poor motivation. Id. at 585. On mental status exam, it was noted that: Claimant was cooperative with good eye contact; she exhibited logical thought content and form; her thought process was concrete; she was anxious and irritable; her affect was restricted; she was oriented in all spheres; her memory and judgment were intact; and her insight, attention/concentration, and motivation/energy were fair. Id. at 585-586. It was noted that Claimant's condition was moderate. Id. at 585.

On October 26, 2017, Claimant complained of decreased energy, anxiety, excessive worries, difficulty concentrating or thinking, and irritability or angry outbursts; but she denied experiencing anhedonia, crying spells, insomnia and hypersomnia, panic attacks, emotional withdrawal or isolation, memory problems, mood shifts, and poor motivation. Id. at 583. It was noted that: Claimant was alert and in no acute distress; she had no visual difficulties or dyspnea;

her coordination and gait were normal; she was cooperative with good eye contact; she exhibited logical thought content and form; her thought process was concrete; she was anxious, sad, and irritable; her affect was restricted; she was oriented in all spheres; her memory and judgment were intact; and her insight, attention/concentration, and motivation/energy were fair.  Id. at 583-84.  It was noted that Claimant was in poor compliance with her medication regimen.  Id. at 584.

On January 11, 2018, Claimant complained of decreased energy, anxiety, excessive worries, difficulty concentrating or thinking, and insomnia; but she denied experiencing anhedonia, crying spells, hypersomnia, panic attacks, emotional withdrawal or isolation, memory problems, excessive fear, poor motivation, irritability or angry outbursts, mood shifts, and sadness. Id. at 580.  It was noted that: Claimant was alert and in no acute distress; she had no visual difficulties or dyspnea; her coordination and gait were normal; she was cooperative with  good eye contact; she exhibited logical thought content and form; her thought process was concrete; she was anxious and distracted; her affect was restricted; she was oriented in all spheres; her recent memory and judgment were intact; and her insight and motivation/energy were fair.  Id at 580-81.  It was noted that there was no significant change in Claimant's condition since her last visit "probably" due to poor compliance with her medication regimen.  Id. at 581.

On February 24, 2018, Claimant complained of decreased energy, anxiety, excessive worries, difficulty concentrating or thinking, mood shifts, and sadness; but she denied experiencing anhedonia, crying spells, insomnia and hypersomnia, panic attacks, emotional withdrawal or isolation, memory problems, excessive fear, poor motivation, and irritability or angry outbursts. Id. at 578.  On mental status exam, it was noted that: Claimant was cooperative with good eye contact; she exhibited logical thought content and form; her thought process was concrete; she was anxious and depressed; her affect was labile; she was oriented in all spheres; her remote memory and judgment were intact; she was distracted; and her insight and motivation/energy were fair.  Id.

14

at 578-79.  It was noted that Claimant showed some improvement since her last visit.  Id. at 579.

On April 24, 2018, Claimant complained of decreased energy, sadness, poor motivation, difficulty concentrating or thinking, anxiety, and excessive worries; but she denied experiencing anhedonia, irritability or angry outbursts, crying spells, hypersomnia and insomnia, panic attacks, emotional withdrawal or isolation, and memory problems.  Id. at 575.  It was noted that: Claimant was in no acute distress; she had no visual difficulties or dyspnea; she had normal coordination and gait; she was cooperative with good eye contact; she exhibited logical thought content and form; her thought process was concrete; she was anxious and depressed; her affect was labile; she was oriented in all spheres; her remote memory and judgment were intact; she was distracted; and her motivation/energy was poor.  Id. at 575-76.  It was noted that there had been no significant change in Claimant's condition since her last visit.  Id. at 576.

On May 9, 2018, Dr. Canosa completed a Medical Assessment of Ability to do Work-Related Activities (Mental) on Claimant's behalf.  Id. at 663-64.  Therein he opined that Claimant's:

> ➢ Ability to function in the following areas was seriously limited but not precluded: deal with public; interact with supervisor(s); function independently; understand, remember, and carry out job instructions that were either simple, detailed but not complex, or complex; behave in an emotionally stable manner; relate predictably in social situations; and demonstrate reliability.

> ➢ Ability to function in the following areas was limited but satisfactory: follow work rules; relate to co-workers; use of judgment; and maintain personal appearance.

Id. at 663.  Dr. Canosa also opined that: Claimant had no useful ability to function in dealing with work stress and maintaining attention/concentration; she presented with elevated anxiety levels, especially when surrounded by crowds; she had constant mood shifts that affected her daily life and relationships; she could worsen if exposed to work-like settings where she was required to work with customers or crowds; she had poor concentration which was attributed to her anxiety

levels and depressive symptoms; and she would not be able to adhere to work regulations, organization, or tasks, or to accomplish set goals established for her.  Id. at 663-64.

### B.  Interamerican Medical Group ("Interamerican Group")

On December 9, 2015, Claimant presented at Interamerican Group, where she denied experiencing chest pain and shortness of breath.  Id. at 505-06.  On physical exam, it was noted that: Claimant was not in acute distress; she was alert and oriented x 3; her cardiovascular exam was unremarkable; and she was anxious.  Id. at 506-07.  Claimant was diagnosed with anxiety disorder, unspecified.  Id. at 507.

### C.  South Florida Pulmonary and Critical Care Associates ("SFPCCA")

On January 8, 2016, Claimant presented at SFPCCA, complaining of intermittent moderate shortness of breath; however, she denied experiencing chest pain/tightness, palpitations, dyspnea/orthopnea, dizziness, visual disturbances, daytime tiredness, depression, and anxiety.  Id. at 704.  On physical exam, it was noted that Claimant was alert and in no distress, and that her cardiovascular exam was unremarkable.  Id. at 705.

### D.  Clinica Corazones Unidos

On August 15, 2016, while on vacation in the Dominican Republic, Claimant had a pacemaker implanted in her heart.  Id. at 550.

### E.  Anais Cortes, M.D. ("Dr. Cortes")

Claimant visited Dr. Cortes from October 5, 2016 to May 25, 2017, from whom she received diagnoses of: POTS; depression; anxiety disorder; and dizziness.  Id. at 629-62.

On October 5, 2016, Claimant presented to Dr. Cortes for an annual exam.  Id. at 634. During that visit, Claimant complained of racing/skipping heart beats and joint pain; but she denied experiencing lightheadedness, near fainting, shortness of breath with exertion, anxiety, mental problems, and depression.  Id. 635.  On physical exam, Dr. Cortes noted that: Claimant was not in

acute distress; her cardiovascular exam was unremarkable; she had a full range of motion in all extremities; she was alert and cooperative; and her mood, affect, attention span, and concentration were normal.  Id. at 636.

On November 30, 2016, Claimant denied experiencing chest pain or discomfort, anxiety, mental problems, and depression.  Id. at 639.  On physical exam, Dr. Cortes noted that: Claimant was not in acute distress; her cardiovascular exam was unremarkable; she had a full range of motion in all extremities; she was alert and cooperative; and her mood, affect, attention span, and concentration were normal.  Id. at 640.  Dr. Cortes also noted that Claimant's pacemaker had been removed since her last visit.  Id. at 641.

On January 17, 2017, Claimant complained of dizziness lasting two weeks; but she denied experiencing chest pain or discomfort, lightheadedness, and shortness of breath with exertion.  Id. at 642.

On May 23, 2017, Claimant complained of numbness in her limbs; but she denied experiencing fatigue, weakness, sleep disorder, near fainting, chest pain or discomfort, racing/skipping heart beats, lightheadedness, shortness of breath with exertion, palpitations, difficulty with concentration, weakness, excessive daytime sleeping, memory loss, anxiety, and depression.  Id. at 645-47.  On physical exam, Dr. Cortes noted that: Claimant was not in acute distress; her cardiovascular exam was unremarkable; she was alert, cooperative, and oriented; and her gait, mood, affect, attention span, and concentration were normal.  Id. at 647-48.  Dr. Cortes noted that Claimant's anxiety had improved and that there was no clinical evidence of heart failure. Id. at 648.

### F.  Interamerican Medical Center ("Interamerican Center")

Claimant visited Interamerican Center from May 25, 2017 to April 23, 2018, where she received diagnoses of: hypotension, unspecified; dizziness; primary pulmonary hypertension;

pulmonary hypertension, unspecified; and aneurysm of the heart.  Id. at 668-775.

During an annual exam on May 25, 2017, Claimant complained of blurred vision, poor balance, dizziness, and sleep disturbance; but she denied experiencing chest discomfort, shortness of breath, chest pain, palpitations, orthopnea, and hypertension.  Id. at 760-61.  On physical exam, it was noted that Claimant's cardiovascular exam was unremarkable and that she was alert.  Id. at 761.

On June 9, 2017, Claimant denied experiencing a change in vision or blurred vision.  Id. at 767.  On physical exam, it was noted that Claimant's cardiovascular exam was unremarkable and that she was alert.  Id. at 768.

On June 22, 2017, Claimant complained of dizziness, but she denied experiencing chest pain related to breathing and chest discomfort.  Id. at 711, 720.  On physical exam, it was noted that Claimant's cardiovascular exam was unremarkable.  Id. at 711.

Records of Claimant's visit with Lourdes Lago, M.D. ("Dr. Lago"), dated June 27, 2017, reflect that Claimant complained of frequent bouts of dizziness; but she denied experiencing chest pain, gait disturbance, lightheadedness, loss of consciousness, muscle weakness, memory impairment, near syncope, difficulty concentrating, insomnia, and psychiatric symptoms.  Id. at 702.  On physical exam, Dr. Lago noted that: Claimant's cardiovascular exam was unremarkable; she was oriented to time, place, person, and situation; her mood and affect were appropriate; and her insight, judgment, memory, balance, and gait were normal.  Id. at 707.

Records of Claimant's visit with Gustavo Cadavid, M.D. ("Dr. Cadavid") dated June 28, 2017, reflect that Claimant complained of fatigue; but she denied experiencing arrhythmias, chest pain, dyspnea, orthopnea, palpitations, muscle weakness, decreased range of motion, disorientation, dizziness, abnormal gait, memory loss, mood swings, and depression.  Id. at 754.  On physical exam, it was noted that: Claimant was alert, cooperative, and oriented x 3; her mood

and affect were appropriate; she was in no acute distress; her cardiovascular exam was unremarkable; and she had a normal range of motion without obvious weakness.  Id. at 755.

On October 25, 2017, Claimant reported that she had been hospitalized two weeks' prior due to chest pain, but she denied experiencing blurred vision.  Id. at 673-74.  On physical exam, it was noted that Claimant's cardiovascular exam was unremarkable and that she was alert.  Id. at 674-75.

On April 23, 2018, Claimant denied experiencing daytime tiredness, depression, and anxiety.  Id. at 671.  On physical exam, it was noted that: Claimant was alert; she was not in distress; and her cardiovascular exam was unremarkable.  Id.

### G.  Gilberto Concepcion, M.D. ("Dr. Concepcion")

Claimant visited Dr. Concepcion, an interventional cardiologist, from May 31, 2017 to October 11, 2017, from whom she received diagnoses of: syncope; bradycardia; chest pain; dyspnea on exertion; dizziness; anemia; mitral regurgitation; heart murmur; tricuspid valve disease; palpitations; atrial aneurysm; primary pulmonary hypertension; and cardiac murmur, unspecified.  Id. at 556-69.

On May 31, 2017, Claimant presented for a cardiovascular evaluation.  Id. at 563.  During that visit, Claimant complained of easy fatigability, dizziness, mild atypical chest pain, and dyspnea on exertion; but she denied experiencing palpitations, syncope, orthopnea, shortness of breath, pain in her muscles or joints, depression, anxiety, and changes in her sleeping habits.  Id. Dr. Concepcion noted that: Claimant was not in acute distress; her cardiovascular exam was unremarkable; and she had no pain in her extremities.  Id. at 564.

On July 5, 2017, Claimant complained of occasional palpitations and atypical chest pain; but she denied experiencing syncope, orthopnea, dyspnea on exertion, shortness of breath, pain in her muscles or joints, depression, anxiety, and changes in her sleeping habits.  Id. at 564-65.  Dr.

Concepcion noted that: Claimant was not in acute distress; she had a Grade 1 systolic murmur; and she had no pain in her extremities.  Id. at 565.  Dr. Concepcion also noted that Claimant had undergone an echocardiogram ("EKG") and had been fitted with a Holter monitor in June 2017, and his impression of those readings was that: Claimant had normal left ventricular systolic and diastolic function; her estimated ejection fraction was about 60%; and the Holter study was normal. Id. 557-60, 565.

On July 19, 2017, Claimant complained of occasional chest pain and continuous palpitations; but she denied experiencing dizziness, chest pain, syncope, orthopnea, dyspnea on exertion, shortness of breath, pain in her muscles or joints, depression, anxiety, and changes in her sleeping habits.  Id. at 566.  Dr. Concepcion noted that: Claimant was not in acute distress; her cardiovascular exam was unremarkable; and she had no pain in her extremities.  Id. at 567.  Dr. Concepcion also noted that Claimant had undergone a Bubble study in July 2017, which yielded normal results.  Id. at 561, 567.

On October 11, 2017, Claimant complained of palpitations; but she denied experiencing dizziness, chest pain, syncope, orthopnea, dyspnea on exertion, shortness of breath, pain in her muscles or joints, depression, anxiety, and changes in her sleeping habits.  Id. at 567-68. Dr. Concepcion noted that: Claimant was not in acute distress; she had a Grade 1 systolic murmur; and she had no pain in her extremities.  Id. at 568.  Dr. Concepcion also noted that Claimant had undergone an extended Holter monitor study following her last visit, which showed no evidence of significative arrhythmia.  Id. at 567-68.

### H.  University of Miami Hospital and Clinics ("UMHC")

Claimant visited UMHC from August 18, 2017 to June 19, 2018.  Id. at 776-823.

On August 18, 2017, it was noted that Claimant's medical history was remarkable for arrhythmia and POTS, regarding which Claimant reported feeling better but still experienced

episodes of dizziness and light headedness.  Id. at 776.  Claimant reported that her treatment for POTS included ingestion of a corticosteroid and sodium tablets.  Id.  Claimant denied experiencing: shortness of breath; chest pain; dizziness; decreased concentration; sleep disturbance; and nervousness/anxiety.  Id. at 781.  On physical exam it was noted that: Claimant was alert and oriented to person, place, and time; she was not in distress; her cardiovascular exam was unremarkable; and her range of motion, mood, affect, and behavior were normal.  Id. at 781-82.

On April 3, 2018, Claimant was seen by Litsa Lambrakos, M.D. ("Dr. Lambrakos"), a cardiologist, at UMHC.  Id. at 799.  Dr. Lambrakos noted that Claimant had been fitted with a Holter monitor on March 27, 2018, which showed that: Claimant's average heart rate was 81 beats per minute ("BPM"); her maximum heart rate was 110 BPM; she had multiple diary entries where she complained of fatigue/tachycardia/dizziness; and her heart rate during those episodes ranged between 80-110 BPM.  Id. at 800.  Claimant complained of fatigue, shortness of breath, chest tightness, visual disturbances, gait problems, dizziness, and palpitations; but she denied experiencing syncope.  Id. at 800, 803-04.  On physical exam, Dr. Lambrakos noted that: Claimant was alert and oriented to person, place, and time; her cardiovascular exam was unremarkable; and her range of motion, mood, and affect were normal.  Id. at 804.  Dr. Lambrakos also noted that an EKG taken on that date showed sinus rhythm with ventricular rates of 60 BPM.  Id.  Dr. Lambrakos recommended that Claimant switch from her corticosteroid medication to a beta-blocker and that she attempt to condition herself with low grade exercise.  Id.  Claimant requested that Dr. Lambrakos complete disability paperwork on her behalf, but Dr. Lambrakos advised that she did not believe that Claimant's POTS merited permanent disability.  Id.

On April 5, 2018, Dr. Lambrakos completed a medical statement regarding heart arrhythmias for Social Security disability claim on Claimant's behalf.  Id. at 665-67.  Therein, Dr.

Lambrakos opined that Claimant suffered from POTS and experienced the following symptoms as a result thereof: syncope and near syncope several times a month; and palpitations, dizziness, and weakness several times a week.  Id. at 665-66.  Dr. Lambrakos further opined that Claimant had the following limitations and abilities: she could not stand at one time for more than 15 minutes; she could not sit at one time for more than 60 minutes; she could only lift 5 pounds on either an occasional or frequent basis; and she would occasionally need to elevate her legs during the course of an 8-hour workday.  Id. at 666.  Dr. Lambrakos also noted that, although Claimant's condition was chronic, her symptoms could improve over time with exercise and medication.  Id. at 665.

On May 22, 2018, Claimant was seen by Dr. Lambrakos.  Id. at 807.  Dr. Lambrakos noted that Claimant had worn a Holter monitor from April 18, 2018 through May 1, 2018, which showed: no arrhythmias; tachycardia 7% of the time; 11 triggered events; an average heart rate of 84 BPM; a maximum heart rate of 135 BPM; a low heart rate of 49 BPM; and that symptom triggered episodes coincided with sinus rhythm and heart rates ranging from 80-90 BPM.  Id. at 808. Claimant complained of palpitations, dizziness, and light headedness; but she denied experiencing chest tightness, shortness of breath, chest pain, and syncope.  Id. at 811.  On physical exam, Dr. Lambrakos noted that: Claimant was alert and oriented to person, place and time; her cardiovascular exam was unremarkable; and her range of motion, mood, and affect were normal. Id. at 812.  Dr. Lambrakos again recommended that Claimant replace her corticosteroid medication with a beta-blocker and that she attempt to condition herself with low grade exercise.  Id.

On June 19, 2018, Claimant sought cardiac clearance from Dr. Lambrakos for an elective hysterectomy and oophorectomy.  Id. at 815.  Claimant complained of palpitations; but she denied experiencing chest tightness, shortness of breath, chest pain, and syncope.  Id. at 819.  On physical exam, Dr. Lambrakos noted that: Claimant was alert and oriented to person, place and time; her cardiovascular exam was unremarkable; and her range of motion, mood, and affect were normal.

Id. at 819-20.   Dr. Lambrakos noted that at an EKG taken that day was normal and again recommended that Claimant make the switch from her corticosteroid medication to a beta-blocker, which she had not yet done.   Id. at 815-16, 820.

## II.      Non-Treating Sources

### A.      State Agency Psychological Consultant Robert Hodes, Ph.D. ("Dr. Hodes")

On March 28, 2016, Dr. Hodes completed a Mental RFC Assessment for Claimant, wherein he opined that Claimant was capable of performing "simple/routine and semiskilled gainful activities if possible [with] reduced social demands."   Id. at 135-37.

### B.      Consultative Examiner - Afzal H. Khan, M.D. ("Dr. Khan")

The Office of Disability Determination referred Claimant to Dr. Khan, an internist, because of her history of panic disorder.   Id. at 514.   On February 9, 2016, Dr. Khan examined Claimant and noted that: she was appropriately groomed, alert, coherent, and oriented x 3; she was cooperative, had a good attitude, and was not in any distress;  she was negative for cardiomegaly and heart murmur; she had 5/5 rated grip and leg strength in both hands and legs; she had endured some periods of intense fear associated with shortness of breath and palpitations; her anxiety had become more prominent and consistent in the months leading up to the examination, which resulted in recurrent sudden onset panic attacks; her memory was good and her judgment was preserved; she had a normal gait and was able to perform heel and toe walking; and her supine and seated straight leg raise tests were normal bilaterally.   Id. at 514-16.   Upon completing his examination, Dr. Khan diagnosed Claimant with panic disorder and arrhythmia.   Id. at 516.

## HEARING TESTIMONY

A hearing, which had been continued from March 21, 2018, was held on July 17, 2018 before ALJ Leibowitz, at which Claimant and VE Kilpatrick testified.   Id. at 65-89.

## I.      Claimant

Claimant testified that her past relevant work included employment as a teacher's aide and as a receptionist.  Id. at 72-73.  Claimant further testified that she suffered from psychiatric and cardiac conditions.  Id. at 75-82.

With respect to her psychiatric conditions, which predated her cardiac condition, Claimant testified that she was undergoing psychiatric treatment for anxiety and panic attacks.  Id. at 77-78.  Claimant testified that she experienced anxiety and panic attacks almost every day for a number of years.  Id.  Claimant explained that her panic attacks occurred multiple times throughout the day and lasted several hours, which required her to take medication and lay down.  Id. at 78.  Claimant testified that, as a result of her psychiatric conditions: she was unable to take care of her children on her own, perform household chores, go outside, ride in elevators, or go to the beach due to the crowds; she experienced crying spells, depression, nervousness, lethargy, difficulty sleeping, and difficulty remembering; she would get tired easily; and she spent her days laying down.  Id. at 78-82.  Claimant testified that her psychiatric condition had further deteriorated since 2018.  Id. at 80.

With respect to her cardiac condition, Claimant testified that she suffered from arrhythmia and had a pacemaker installed in 2016 because she experienced symptoms of: tachycardia; blurry vision; sweaty hands; and shortness of breath.  Id. at 75.  Claimant explained that her pacemaker did not alleviate her symptoms and that she continued to experience, "almost all day[,]" the following:  tachycardia; syncope; dizziness; shortness of breath; chest pains; drops in blood pressure; and blurry vision.  Id.  Claimant testified that, because of her arrhythmia: she could not walk more than a block without experiencing tachycardia, shortness of breath, and a drop in blood pressure; she could not stand for more than five minutes without feeling faint and experiencing tachycardia, a drop in blood pressure,  shortness of breath,  agitation, and blurry vision; she could

24

slowly squat and kneel, but she would feel faint and dizzy upon trying to get back up; and, upon getting up from a seated position, her hands would sweat and she would experience coldness, tachycardia, and palpitations.  Id. at 75-77.

## II.      VE Kilpatrick

VE Kilpatrick classified Claimant's prior work as follows:

➢  Teacher's aide, DOT # 249.367-074,[6] with an exertional level of light[7] and a Specific Vocational Preparation ("SVP") of 3.[8]  Id. at 84.

➢  Receptionist, DOT # 237.367-038, with an exertional level of sedentary[9]  and an SVP of 4.[10]   Id.

ALJ Leibowitz posed three hypotheticals to VE Kilpatrick regarding an individual of Claimant's age, education, and work experience who:

1.) could work at the light exertional level with the following limitations: could occasionally climb ramps and stairs, but could never climb ladders, ropes or scaffolds; could occasionally balance, stoop, kneel, crouch, and crawl; could

---

[6] DOT is the acronym for the Dictionary of Occupational Titles, which was created by the Employment and Training Administration and groups jobs based on their similarities, and defines the structure and content of all listed occupations.  See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

[7] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. §§ 404.1567(b), 416.967(b).

[8] SVP is defined in the DOT as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.
An SVP of 3 means that preparation for the job should take "over 1 month up to and including 3 months." Id.

[9] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. §§ 404.1567(a), 416.967(a).

[10] An SVP of 4 means that preparation for the job should take "over 3 months up to and including 6 months." See  Dictionary  of  Occupational  Titles  app.  c  (4th  ed.,  rev.  1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

occasionally be exposed to extreme cold, extreme heat, wetness, and humidity; could occasionally be exposed to vibration; could occasionally be exposed to environmental irritants such as dust, odors, fumes, and pulmonary irritants; could occasionally be exposed to hazards; was limited to routine tasks that could be learned in 30 days or less; and could occasionally interact with a supervisor, coworkers, and the public.

2.) had the same abilities as the individual Hypothetical No. 1, except that this individual could perform work at the sedentary exertional level.

3.) had the same abilities as the individuals in Hypothetical Nos. 1 and 2, except that this individual would be off task 20% of the day.

Id. at 84-86.

VE Kilpatrick testified that the individual in Hypothetical No. 1 would be unable to perform Claimant's past work, but would be able to perform the following representative jobs:

➢ Office Helper, DOT # 239.567-010, with an exertional level of light and an SVP of 2,[11] with approximately 105,000 jobs in the national economy;

➢ Folder, DOT # 369.687-018, with an exertional level of light and an SVP of 2, with approximately 117,000 jobs in the national economy; and

➢ Mail Sorter, DOT # 209.685-026, with an exertional level of light and an SVP of 2, with approximately 76,000 jobs in the national economy.

Id. at 84-85.  VE Kilpatrick testified that the individual in Hypothetical No. 2 would be able to perform the following representative jobs:

➢ Addresser, DOT # 209.587-010, with an exertional level of sedentary and an SVP of 2, with approximately 101,000 jobs in the national economy;

➢ Lens Inserter, DOT # 713.687-026, with an exertional level of sedentary and an SVP of 2, with approximately 90,000 jobs in the national economy; and

➢ Call-Out Operator, DOT # 237.367-014, with an exertional level of sedentary and an SVP of 2, with approximately 42,000 jobs in the national economy.

Id. at 85.  VE Kilpatrick testified that the individual in Hypothetical No. 3 would not be employable

---

[11]  An SVP of 2 means that preparation for the job should take "[a]nything beyond short demonstration up to and including 1 month."   Dictionary of Occupational Titles app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

in the national economy.  Id. at 86.

Claimant's counsel then posed two hypotheticals to VE Kilpatrick regarding an individual

of Claimant's age, education, and work experience who:

1.) could only stand at any one time for 15 minutes or sit at any one time for 60 minutes; could only lift occasionally and lift frequently five pounds; and must elevate her legs above heart level up to 1/3 of an eight-hour workday.

2.) had no useful ability to function whatsoever in dealing with work stress and maintaining attention and concentration; and had a seriously limited, although not completely precluded, ability to function in the following areas: dealing with the public; interacting with supervisors; functioning independently; understanding, remembering, and carrying out even simple job instructions; demonstrating reliability; relating predictably in social situations; and behaving in an emotionally stable manner.

Id. at 86-88.  VE Kilpatrick testified that neither individual in the hypotheticals posed by

Claimant's counsel would be able to engage in Claimant's past relevant work or would be

employable in the national economy.  Id. at 87-88.

## STANDARD OF REVIEW

A federal court's "review of a social security case is demarcated by a deferential

reconsideration of the findings of fact and exacting examination of the conclusions of law."

Williams v. Astrue, 416 F. App'x 861, 862 (11th Cir. 2011).  Thus,

[t]he Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.

Kieser v. Barnhart, 222 F. Supp. 2d 1298, 1305 (M.D. Fla. 2002) (citations omitted).  However,

the Commissioner's "conclusions of law, including applicable review standards, are not presumed

valid."  Williams, 416 F. App'x at 862.

## <u>REGULATORY FRAMEWORK:  THE FIVE-STEP SEQUENTIAL PROCESS</u>

The Social Security Regulations outline a five-step "sequential" evaluation process used to determine whether a claimant is disabled.

First, the ALJ must determine whether a claimant is engaged in "substantial gainful activity" ("SGA").  If the ALJ finds that the claimant is engaging in SGA, then the ALJ must find that the claimant is not disabled.  <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1237 (11th Cir. 2004).  In this case, ALJ Leibowitz determined that Claimant had not engaged in SGA since the amended alleged onset date of June 30, 2015, and proceeded to step two.  TR. 17.

At the second step, the ALJ must determine if a claimant's impairments are "medically severe."  If the ALJ determines that the claimant's impairments are medically severe, then he or she must proceed to the third step.  <u>Phillips</u>, 357 F.3d at 1237.  In this case, ALJ Leibowitz found that Claimant suffered from the following severe impairments: dysphagia; recurrent arrhythmias; degenerative disc disease; anxiety disorders; affective disorders; POTS; and coronary artery disease.  TR. 18.  ALJ Leibowitz then proceeded to step three.  <u>Id.</u>

At step three, the ALJ must determine if a claimant's impairment(s) "meet or equal" any of the listed impairments in the regulations.  <u>Phillips</u>, 357 F.3d at 1238.  If so, the ALJ must find the claimant disabled; if not, then the ALJ should proceed to step four.  <u>Id.</u>  Here, ALJ Leibowitz determined that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  TR. 18-20.  Therefore, ALJ Leibowitz proceeded to step four.  <u>Id.</u> at 20-24.

Step four is a two-pronged process, which first requires the determination of a claimant's RFC and then, based on that RFC, a determination of whether the claimant can return to any "past relevant work."  <u>Phillips</u>, 357 F.3d at 1238.  As to the first prong, ALJ Leibowitz determined that Claimant had the RFC to:

perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), except that she can occasionally climb ramps and stairs, never climb ladders, ropes, and scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl. [Claimant] can have only occasional exposure to extreme cold and extreme heat, wetness, humidity, vibration, environmental irritants such as dusts, odors, fumes, and pulmonary irritants, and hazards. [Claimant] is limited to simple, routine tasks that can be learned in 30 days or fewer and can only occasionally interact with supervisors, coworkers, and the public.

TR. 20-24.  ALJ Leibowitz moved to prong two of step four and concluded that Claimant was unable to perform any past relevant work.  Id. at 24-25.  ALJ Leibowitz then proceeded to the fifth and final step.  Id. at 24-26.

Step five requires the ALJ to determine whether the claimant is able to do any work considering the claimant's age, education, work experience, and RFC.  Phillips, 357 F.3d at 1239-40.  ALJ Leibowitz determined that, given Claimant's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy which Claimant could perform.  TR. 25-26.  Therefore, ALJ Leibowitz concluded that Claimant was not under a disability, as defined in the Social Security Act, since June 30, 2015.  Id. at 26.

## DISCUSSION

As previously noted, Claimant argues that:

I.     The ALJ committed reversible error in failing to set forth the requisite good cause for according just "little" weight to the opinions of Claimant's treating psychiatrist, Dr. Canosa, and just "partial" weight to the opinions of Claimant's treating cardiologist, Dr. Lambrakos.

II.    The ALJ's RFC finding is not supported by the substantial evidence of record.

III.   The ALJ failed to properly assess Claimant's alleged symptoms and limitations.

See Claimant's Motion for Summary Judgment [D.E. 21 at 6-19].  The undersigned finds no merit in Claimant's arguments.

### I.  The ALJ's weighing of the opinions of Drs. Canosa and Lambrakos.

"The ALJ must consider medical opinions together with relevant evidence in the record."

Hand v. Soc. Sec. Admin., Comm'r, No. 18-14147, 2019 WL 4447206, at *3 (11th Cir. 2019) (citing 20 C.F.R. § 404.1527(b)).  When weighing medical opinions, "the ALJ should consider the following factors: the examining and treatment relationship between the claimant and doctor; the supportability and consistency of the opinion with the record as a whole; the specialization of the doctor; and other factors that tend to support or contradict the opinion."  Hand, 2019 WL 4447206, at *3 (citing 20 C.F.R. § 404.1527(c)).  "Generally, a treating source's opinion is given 'substantial or considerable weight unless good cause is shown to the contrary."  Lara v. Comm'r of Soc. Sec., 705 F. App'x 804, 811 (11th Cir. 2017) (quoting Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997)).  Good cause exists when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Phillips, 357 F.3d at 1241 (citing Lewis, 125 F.3d at 1440).  "If the ALJ gives less than controlling weight to a treating source's opinions, the ALJ must clearly articulate the reasons for doing so."  Lara, 705 F. App'x at 811.  "When the ALJ has articulated specific reasons for failing to give the opinion of a treating physician controlling weight, and those reasons are supported by substantial evidence, there is no reversible error."  Weekley v. Comm'r of Soc. Sec., 486 F. App'x 806, 808 (11th Cir. 2012) (citing Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005)).

   a.  Dr. Canosa's medical opinions

   ALJ Leibowitz discounted Dr. Canosa's medical opinions because they were "unsupported by the record as a whole" and "inconsistent with the opinion of Dr. Hodes[.]"  TR. 23-24.  ALJ Leibowitz explained:

> I have considered the opinion of Oscar Canosa, M.D., [Claimant's] psychologist, and give it little weight.  Dr. Canosa opined that [Claimant] cannot deal with work stress or maintain attention/concentration, and she has poor ability to deal with the public, interact with supervisors, and function independently.  He also opined that she has poor ability to understand, remember, and carry out even simple job

instructions, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability.  I find that Dr. Canosa's opinion is unsupported by the record as a whole.  Treating reports have described [Claimant's] mentation as normal, with logical thought form, concrete thought process, and no perceptual disturbances, and her recent and remote memory as intact.  These reports have also described [Claimant] as fully oriented, in no acute or apparent distress, cooperative and friendly with good eye contact and generally calm behavior.  Dr. Canosa's opinion is also inconsistent with the opinion of Dr. Hodes, who opined that [Claimant] can perform simple, routine, and semi-skilled tasks with reduced social demands.

Id. (citations omitted).

Thus, ALJ Leibowitz showed good cause to discount Dr. Canosa's medical opinions, which was sufficiently supported by substantial evidence.  See Strickland v. Comm'r of Soc. Sec., 516 F. App'x 829, 831 (11th Cir. 2013) ("We may not reweigh the evidence and decide facts anew and must defer to the ALJ's decision if it is supported by substantial evidence even if the evidence may preponderate against it.") (citing Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005)).

Claimant argues that ALJ Leibowitz's decision to accord great weight to Dr. Hodes' medical opinion was erroneous because he was a non-examining psychological consultant who rendered his opinion without reviewing the complete record.  See Claimant's Motion for Summary Judgment [D.E. 21 at 14].  However, as noted above, ALJ Leibowitz reviewed the complete record, properly discounted Dr. Canosa's medical opinions, found that Dr. Hodes' medical opinion was consistent with the overall record, and supported her determination to accord great weight to Dr. Hodes' medical opinion with substantial evidence.  TR. 23.  Therefore, there is no error in ALJ Leibowitz's weighing of Dr. Canosa's medical opinions.  See Benefiel v. Colvin, No. 12-CV-1315, 2013 WL 4495170, at *7 (M.D. Fla. 2013) ("[W]hen the [ALJ] properly discounts the opinion of an examining or a treating physician, the [ALJ] may give substantial weight to the opinion of a non[-]examining reviewing source who is considered an expert in Social Security disability evaluation and whose opinion is consistent with the overall record.") (citing Milner v.

Barnhart, 275 Fed. Appx. 947, 948 (11th Cir. 2008)); see also Anderson v. Colvin, No. 14-CV-256, 2015 WL 1347414, at *5 (M.D. Fla. 2015) (finding that the ALJ did not err in according great weight to the medical opinions of non-examining physicians who did not review the claimant's complete record because the ALJ, who had reviewed the entire record, found that their opinions were consistent with the record as a whole); Virgin v. Comm'r of Soc. Sec., No. 16-CV-763, 2017 WL 4277542, at *7 (M.D. Fla. 2017) (although the opinion of a non-examining consultative physician is not, standing alone, good cause to discount the medical opinions of a treating physician, "an ALJ is not prohibited from considering this evidence when weighing the opinion of a treating physician.") (citing Straka-Acton v. Comm'r of Soc. Sec., No. 14-CV-630, 2015 WL 5734936, at *3 (M.D. Fla. 2015)).

   b.   Dr. Lambrakos' medical opinions

   ALJ Leibowitz discounted Dr. Lambrakos' medical opinions because they were not "fully supported by the treating record[.]"  TR. 24.  ALJ Leibowitz explained:

> I have considered the opinion of Litsa Lambrakos, M.D., [Claimant's] treating physician, and give it partial weight.  Dr. Lambrakos opined that [Claimant] can stand for up to 15 minutes and sit for up to 60 minutes at a time, can lift up to five pounds frequently, and occasionally must elevate her legs during an 8-hour workday, which restricts her to less than sedentary exertional work.  I find that Dr. Lambrakos'[] opinion is not fully supported by the treating record, which has reported that [Claimant] has been able to control her symptoms of POTS with medication.  Dr. Lambrakos'[] opinion is also unsupported by musculoskeletal examinations showing no problems with [Claimant's] gait or ambulation and noting her full range of motion, 5/5 muscle strength in all extremities, normal heel and toe walking, normal sensation, reflexes, and coordination.  The treating record clearly shows that [Claimant] is capable of work at the sedentary exertional level.

Id. (citations omitted).  Thus, ALJ Leibowitz showed good cause for discounting Dr. Lambrakos' medical opinions, which was sufficiently supported by substantial evidence.  Strickland., 516 F. App'x at 831.  Therefore, there is no error in ALJ Leibowitz's weighing of Dr. Lambrakos' medical opinions.

**II. ALJ Leibowitz's RFC assessment.**

"The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." SSR 96-8p.[12]  Further, "[t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." Id.  "In all events, there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision is not a broad rejection which is 'not enough to enable the district court or this Court to conclude that the ALJ considered her medical condition as a whole.'" Dyer, 395 F.3d at 1211 (alterations omitted) (quoting Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995)).  The ALJ's "opinion must describe his analysis with enough detail to satisfy a reviewing court that he gave all of the relevant evidence before him its due regard." Turner ex rel. Turner v. Barnhart, 377 F. Supp. 2d 1165, 1168 (M.D. Ala. 2005) (citing Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981)).  When substantial evidence supports the ALJ's decision, it must be affirmed. Strickland, 516 F. App'x at 831.

In her discussion of Claimant's RFC, ALJ Leibowitz explained that: she "considered all symptoms and the extent to which [those] symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 16-3p"; and she "also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927." TR. 21.  As previously noted, ALJ

---

[12] SSR 96-8p sets forth the SSA's policies and policy interpretations regarding the assessment of a claimant's RFC. SSR 96-8p, 1996 WL 374184 (July 2, 1996).  According to this policy interpretation, the Commissioner is required to consider all relevant evidence in the case record in making the RFC determination. Id.; see also Lewis, 125 F.3d at 1440 ("The [RFC] is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments.") (citing 20 C.F.R. § 404.1545(a)).

Leibowitz found that Claimant had the RFC to:

> perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), except that she can occasionally climb ramps and stairs, never climb ladders, ropes, and scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl. [Claimant] can have only occasional exposure to extreme cold and extreme heat, wetness, humidity, vibration, environmental irritants such as dusts, odors, fumes, and pulmonary irritants, and hazards. [Claimant] is limited to simple, routine tasks that can be learned in 30 days or fewer and can only occasionally interact with supervisors, coworkers, and the public.

Id. at 20-21.  In reaching that conclusion, ALJ Leibowitz articulated her rationale as follows:

> The record shows that [Claimant] has been diagnosed with recurrent arrhythmias, bradycardia, and postural orthostatic tachycardia syndrome (POTS).  Treating reports note that since her alleged onset date of disability, [Claimant] has complained of dizziness, palpitations, mild chest pain, syncope, and weakness.  An echocardiogram taken in June 2017 showed mild intermittent mitral valve prolapse, mild mitral regurgitation, mild to moderate tricuspid insufficiency, and mild life ventricular hypertrophy.  However, treating reports show otherwise unremarkable cardiovascular findings, e.g., normal heart rate and rhythm, no pulse deficits, no cardiomegaly, no murmurs, rubs, or gallops, no dyspnea on exertion or shortness of breath, as well as a normal gait, normal ambulation, and no assistive device. [Claimant] has been prescribed low-dose propranolol and has been strongly advised to condition herself with low-grade exercise such as a seated bicycle.  [Claimant's] internist, Litsa Lambrakos, M.D., stated that although [Claimant's] POTS is a chronic condition, her symptoms of syncope and near syncope, palpitations, dizziness, and weakness can improve with exercise and medication, and in fact [Claimant] has reported improvement of her symptoms with medication.

***

> [Claimant] has reported symptoms of anxiety and affective disorder, including panic attacks, anxious mood, crying spells, and lack of motivation.  However, the record shows that [Claimant's] allegations of severe functional limitations caused by her mental health conditions are not generally supported by her provider reports, which have consistently reported her as fully oriented, in no acute or apparent distress, cooperative and friendly, with good eye contact and generally calm behavior.  The reports noted no signs of hallucinations, delusions, suicidal or homicidal ideation, appetite disturbance, anhedonia, psychomotor agitation, or manic thinking.

> The record shows that [Claimant's] mental health conditions have been described as mild or moderate and controlled by her medications.  [Claimant] has received multiple sessions of psychotherapy as well as various courses of medication during the last two years, which has resulted in notable improvement of her symptoms. Treating reports include the following notes: "Patient is at baseline and is feeling

34

better with the current medication plan"; "Improvement has been seen with the current medication plan, we will continue with the same treatment"; [Claimant] is "showing some improvement since last visit."; [Claimant's] disorders are "better since last visit"; "she states that she notices improvement with Clonazepam. The patient reports feeling well with the current treatment plan.  Although some symptoms are still active, the medications have contributed to reducing them to a certain degree."; "Assessed DX of Anxiety Disorder as improved."  Moreover, [Claimant] herself has reported improvement to her mental health providers that her symptoms have improved with therapy and medication, e.g., "I feel better."

***

As for the opinion evidence, I have considered the opinion of the state agency psychological consultant, Robert Hodes, Ph.D., and give it great weight.  Dr. Hodes opined that [Claimant] is capable of performing simple, routine, and semi-skilled tasks with reduced social demands.  I find that this opinion is supported by provider reports in the record detailing [Claimant's] persistent symptoms of anxiety, including crying spells and panic attacks, as well as her testimony describing these symptoms as well as her general low mood and lack of motivation.

Id. at 21-23 (citations omitted).

Based on the foregoing explanations and citations to Claimant's medical record by ALJ Leibowitz, the undersigned concludes that the ALJ's RFC assessment was supported by substantial evidence.  See Strickland, 516 F. App'x at 831.  Therefore, ALJ Leibowitz did not err in making her RFC assessment.

**III. The ALJ's assessment of Claimant's alleged symptoms and limitations.**

When considering a claimant's symptoms, the ALJ must follow a two-step process: "Step one is to determine whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms."  Contreras-Zambrano v. Soc. Sec. Admin., Comm'r, 724 F. App'x 700, 703 (11th Cir. 2018) (citing SSR 16-3p, 82 Fed. Reg. 49,462, 49,463-64 (Oct. 25, 2017)).  "Step two is to evaluate the intensity and persistence of an individuals' symptoms, such as pain, and determine the extent to which an individual's symptoms limit her ability to perform work-related activities."  Contreras-Zambrano, 724 F. App'x at 703 (citing SSR 16-3p, 82 Fed. Reg. at 49,464-66).  "An ALJ considers whether there are any inconsistencies in

the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence, including [her] history, the signs and laboratory findings, and statements by [her] medical sources or other persons about how [her] symptoms affect [her]."  20 C.F.R. § 404.1529(c)(4).   SSR 16-3p, effective October 25, 2017, clarified that "subjective symptom evaluation is not an examination of an individual's character."  82 Fed. Reg. at 49,463.

In her Unfavorable Decision, ALJ Leibowitz stated:

> [Claimant] has alleged that mental problems and an eating disorder limit her ability to work.  She testified that despite receiving a pacemaker, she still experiences daily symptoms of tachycardia, i.e., dizziness, shortness of breath, fatigue, chest pains, low blood pressure, and blurred vision.  [Claimant] testified that due to these symptoms, she can walk only one city block before her tachycardia symptoms arise and can cause her to faint.  She can also only stand for a maximum of five minutes before these symptoms arise.  [Claimant] can perform a squat but only very slowly, as if she rises too quickly, she will faint.  [Claimant] testified that she also suffers from anxiety every day, as well as panic attacks that last hours.  Her panic attacks are triggered by "going out to the streets" and riding in an elevator, which makes her feel too confined.  She testified that when she suffers these attacks, she cannot clean the house or cook. [Claimant] testified that she has trouble remembering things because of her intense anxiety and that during a typical day she experiences many crying spells, has no desire to do anything, and spends most of the day lying down.

> After careful consideration of the evidence, I find that [Claimant's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Claimant's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . .

TR. 21 (citation omitted).

ALJ Leibowitz supported this conclusion by explaining that:

> ➢ "[T]reating reports show otherwise unremarkable cardiovascular findings, e.g., normal heart rate and rhythm, no pulse deficits, no cardiomegaly, no murmurs, rubs, or gallops, no dyspnea on exertion or shortness of breath, as well as a normal gait, normal ambulation, and no assistive device."

> ➢ Claimant reported to her medical providers that her symptoms resulting from her cardiac and psychiatric conditions had improved with medication.

36

> ➢ Dr. Lambrakos stated that Claimant's "symptoms of syncope and near syncope, palpitations, dizziness, and weakness [could] improve with exercise and medication . . . ."

> ➢ Reports from Claimant's providers "have consistently reported her as fully oriented, in no acute or apparent distress, cooperative and friendly, with good eye contact and generally calm behavior. The reports noted no signs of hallucinations, delusions, suicidal or homicidal ideation, appetite disturbance, anhedonia, psychomotor agitation, or manic thinking."

> ➢ Claimant's claims regarding her panic attacks "lasting for several hours" and occurring "many times during the day" "conflict[ed] with the reports of [Claimant's] providers, which have consistently noted that she was in no apparent or acute distress at any of her medical appointments or emergency room visits."

Id. at 21-23 (citations omitted)

Because ALJ Leibowitz supported her findings regarding Claimant's allegations of the intensity, persistence, and limiting effects of her symptoms with substantial evidence, there is no error in the ALJ's assessment of Claimant's alleged symptoms and limitations. See Strickland, 516 F. App'x at 831.

## **RECOMMENDATION**

Based on the foregoing considerations, the undersigned **RESPECTFULLY RECOMMENDS** that Claimant's Motion for Summary Judgment [D.E. 21] be **DENIED**, the Commissioner's Motion for Summary Judgment [D.E. 22] be **GRANTED**, and the Commissioner's decision be **AFFIRMED**.

Pursuant to Local Magistrate Judge Rule 4(b), the parties have **fourteen days** from the date of this Report and Recommendation to file written objections, if any, with the Honorable Darrin P. Gayles. Failure to timely file objections shall bar the parties from attacking on appeal the factual findings contained herein. See Resolution Tr. Corp. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993). Further, "failure to object in accordance with the provisions of [28 U.S.C.]

§ 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." <u>See</u> 11th Cir. R. 3-1 (I.O.P. - 3).

      RESPECTFULLY SUBMITTED in Miami, Florida this <u>22nd</u> day of July, 2020.

ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

cc:    United States District Judge Jose E. Martinez
      Counsel of Record